**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CAROLYN SAMPSON, | ) |
| | ) |
| Plaintiff, | ) **COMPLAINT** |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) Case No.: |
| | ) |
| HAGENS BERMAN SOBOL SHAPIRO LLP; | ) |
| KAY GUNDERSON REEVES; STEVE W. | ) Related Case: 2:11-cv-05782 PD |
| BERMAN, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

### INTRODUCTION

1.      The most fundamental rules governing attorney-client relationships are: 1) that lawyers treat their clients with absolute honestly, and 2) that lawyers put their client's interests ahead of their own. These rules apply even when, in fact especially when, absolute honesty and loyalty to their clients is unpleasant or detrimental to the lawyer's own financial interests.

2.      These rules, and others, were broken by Hagens Berman Sobol Shapiro LLP (Hagens Berman) as well as individual attorneys, including Kay Gunderson Reeves (Reeves) and Steve W. Berman (Berman).  Hagens Berman put the protection of its own financial, publicity, and reputational interests before those of the clients that they recruited into a lawsuit without a fair disclosure of their chances of success. By breaking the rules, the defendants have caused substantial harm to their clients', including the named plaintiff's, emotional, financial, and physical well-being.

3.      This is a story as old as the legal profession. It is the story of lawyers who over-promised, under-delivered, and misled their own clients—before pulling the rug out from under them to further the lawyers' financial interests.  It is a story about why lawyers are held to strict fiduciary duties.

4.      Life-altering birth injuries and disabilities make it difficult for many victims of thalidomide, a well-known teratogen used experimentally in the United States in the late 1950s and early 1960s, to get jobs, raise families, or participate in day-to-day activities that those without such disabilities take for granted. Many of the victims of thalidomide are extraordinarily intelligent, tough, resilient, and independent. But a lifetime of personal, professional, and financial difficulties made them uniquely vulnerable to the snake oil of false hope peddled as fair compensation for a lifetime of struggle.  The defendants in this case knew about and played on that vulnerability.

**PARTIES**

5.      Plaintiff Carolyn Sampson is an individual residing in Burnsville, MN.

6.      On information and belief, Defendant Steve W. Berman is the founder and managing partner of Hagens Berman Sobol Shapiro LLP and is an attorney in the Seattle office located at 1301 Second Avenue, Suite 2000, Seattle, WA 98101.   On further information and belief, Steve W. Berman manages all the significant litigation undertaken by Hagens Berman which includes personal involvement in all significant strategic decisions, including those described herein. Steve Berman may be held personally liable for his participation in the intentional torts alleged.

7.      On information and belief, Defendant Hagens Berman Sobol & Shapiro LLP is registered as a Washington limited liability partnership with its home offices at 1301 Second

Avenue, Suite 2000, Seattle, WA 98101. On further information and belief, Hagens Berman does not operate as a true legal partnership, but rather as a vehicle for the pursuit of founder Steve Berman's personal and business interests. Depending on facts developed in discovery, Steve Berman may be personally liable for any debts or obligations incurred by Hagens Berman.

8.       On information and belief, Defendant Kay Gunderson Reeves is a resident of Seattle, Washington and is an attorney in the Dallas office of Waters Kraus & Paul located at 3141 Hood Street, Suite 700, Dallas, TX 75219 and was formerly a named partner in the firm Gordon & Reeves in Dallas Texas. On further information and belief, Kay Gunderson Reeves may be held personally liable for her participation in the intentional torts set forth herein.

## JURISDICTION AND VENUE

9.       Jurisdiction is proper under 28 U.S.C. § 1332(a) as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

10.       Venue is proper in this district under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in this district and are related to litigation pending in this district: *Johnson v. SmithKline Beecham et al.*, Case No. 2:11-cv-05782-PD.

## FACTUAL BACKGROUND

11.       Following litigation related to a fund for thalidomide survivors in Australia, Peter Gordon, the attorney primarily responsible for pursuing the Australian litigation, raised the possibility of pursuing litigation on behalf of victims of thalidomide in the United States. Gordon began working with Reeves who undertook responsibility for finding and recruiting U.S. thalidomide victims into litigation against the pharmaceutical companies responsible for

the manufacture and distribution of thalidomide in the United States. On information and belief, from the outset neither Gordon nor Reeves intended to substantively litigate any case on behalf of thalidomide victims, but rather to turn primary responsibility for the litigation over to other attorneys.

12.     Beginning in late 2010, Reeves and Gordon engaged in discussions with the Lanier Law Firm, the Hagens Berman firm, and Steve Berman personally about handling litigation on behalf of plaintiffs recruited by Reeves. The Lanier Law Firm filed a case on behalf of two U.S.-based thalidomide victims in May 2011. After that filing, and on information and belief, Hagens Berman replaced the Lanier Law Firm as trial counsel on behalf of U.S. thalidomide plaintiffs. After Hagens Berman replaced the Lanier Law Firm, Reeves continued to work with Hagens Berman and on further information and belief was either or both paid directly by Hagens Berman and/or entitled to a portion of any recovery.

**PLAINTIFF SAMPSON**

13.     Plaintiff Sampson was born with several profound birth injuries in the spring of 1962.  A proud, independent, and intelligent woman, she endured her disability despite the limitations that it placed on her life.  She got married, raised children, and built a career as a journalist, among other accomplishments.

14.     Sampson knew that her mother had taken certain capsules during her pregnancy and she suspected that the pills may have been the cause of her disability. She investigated whether the pills were responsible by contacting, in 1982 and within the applicable statute of limitations, a personal injury attorney in Minnesota.  The attorney unsuccessfully attempted to review her mother's medical records including those related to Sampson's birth, which had been lost.  The attorney also investigated a pill that her mother

had kept for two decades by sending the pill to a laboratory to determine whether its ingestion could cause Sampson's birth injuries. The investigation could not establish whether the capsule was thalidomide and she was advised at the time that she would not be able to pursue a claim in litigation.

15. Hearing the result of her Minnesota attorney's investigation, Sampson got on with her life. After all, if a prominent personal injury attorney could not identify the source of her injury, what chance did she have on her own?

16. As Sampson aged, however, her injuries began causing her significant pain. Physical pain associated with her disability began in 1992, and she worried that she would be unable to support her two children as a single mother. Through ergonomics and many adaptations in Sampson's personal life (such as giving up crocheting, sewing and other hobbies) she was able to mitigate her pain sufficiently to continue her education and earn both a bachelor's and master's degree.

17. For many years, Sampson made a good living. However, beginning in 2009, her hand, arm, back and neck pain worsened to the point that it was difficult for her to perform her job in marketing communications. During this period, Sampson became concerned that she would have to claim Social Security Disability Insurance to maintain any semblance of financial security. This fear led her to search out others with similar experiences.

**SAMPSON & REEVES**

18. On September 11, 2011, Sampson began searching for other people who might share her unique birth injuries and be experiencing similar physical pain. On September 20, 2011 Sampson inquired in a private Facebook group for people with thalidomide injuries if there were any Americans.

19.     Seven days later, Sampson received a phone call from Mercedes Benegbi, leader of the Canadian thalidomide campaign for compensation. Benegbi said a lawsuit was being filed in the U.S. and provided a telephone number for an attorney in Texas named Kay Gunderson Reeves. Sampson called Reeves that day and within a few hours Reeves returned her phone call.

20.     Sampson spoke to Reeves for approximately 90 minutes.

21.     Within the first few minutes of speaking to Reeves about potential litigation, Sampson told Reeves that she had no interest in becoming entangled in a lawsuit that dragged on for a decade or more. Reeves responded, "oh no, it's only going to take 18 months." Reeves then explained that the "new information," Peter Gordon's leadership, and the negative publicity the case would generate for the pharmaceutical defendants would lead to a resolution within the 18-month timeframe. Reeves either knew that this information was false or asserted the timeline with reckless indifference to its truth.

22.     During the initial call, Sampson advised Reeves of her prior attorney's investigation decades earlier. Reeves told Sampson that her prior attorney's failure to identify whether the capsule was thalidomide strengthened her claim because it proved that even though she suspected that thalidomide caused her birth injuries, there was no way for her to learn the truth.

23.     Reeves also explained that the "new information" would overcome the statute of limitations and ensure that Sampson and other thalidomide victims received compensation for their injuries. Sampson had only recently begun in-depth research into thalidomide. The "new information" Reeves relayed to Sampson in that initial phone call included:

- Thalidomide was handed out to women in unmarked envelopes as samples at the doctor's office and no records were kept of who got it. In at least one case, it was left in the mailbox for a woman to pick up. Sampson responded to this information by stating that "It all makes sense now!" as the capsule that her mother kept for 20 years was in a prescription bottle for an unrelated medication.

- The doctors who formulated thalidomide had served time as Nazi war criminals before being hired by Grunenthal and had possibly tested the drug on concentration camp prisoners. While this statement may have been factually true, on information and belief, its purpose was to inspire anger toward Grunenthal by Sampson.

- The drug companies had known for years that thalidomide caused birth defects before it was finally banned. Reeves described a baby born in the late 1950s that Smith Kline & French, the predecessor to GlaxoSmithKline (GSK), knew had been injured by thalidomide, but that GSK did not report to the Food and Drug Administration until the early 1960s;

24.    Because of Sampson's relatively limited knowledge about thalidomide, she trusted that the "new information" described by Reeves was not widely known. At a minimum, the information was new to Sampson.

25.    Reeves also told an optimistic story about potential thalidomide litigation in the United States and Sampson's role:

- Reeves told Sampson that Peter Gordon had started a lawsuit in Australia that they were close to winning and that their success would lead to thalidomide survivors in every country finally winning compensation.

- Reeves told Sampson that she was "very articulate" and that her story could play an important role in the case.

26.     Sampson's birth injuries were and are a constant, gnawing threat to her ability to support herself and her family. And Reeves pitch to Sampson went right to the heart of the core insecurities that had dominated her life. Sampson was vulnerable to Reeve's assertion that the pharmaceutical defendants that distributed thalidomide would soon be held responsible and Sampson would be freed from her precarious financial position. Sampson agreed to representation by Reeves.

27.     On September 29, 2011 Sampson received a packet of material from Reeves. The cover letter was a form letter that was sent to numerous potential thalidomide plaintiffs. The form letter included various general disclaimers about the length and difficulties inherent in the litigation—including overcoming the statute of limitations. The letter emphasized, however, that the difficulties "may not apply to each case in the same way" adding that "some people can make a stronger case to extend the time period in which they can sue than others." Because the form letter included no individualized discussion of the obstacles for Sampson's specific case, Sampson interpreted the letter as a formality. Sampson continued to believe the assessment of her individual facts that she received during her phone call from Reeves and that the phone call accurately represented Reeves' view of her case.

28.     The packet of materials Sampson received from Reeves included both an Attorney Employment Agreement and a questionnaire requesting information about

Sampson's injuries and other information.  The Attorney Employment Agreement included a provision that provided Reeves "the discretion to associate, retain or otherwise employ other attorneys to perform legal services in connection with this Agreement at Attorney's expense." The section further stated: "Prior to the consummation of any agreement to associate, retain or otherwise employ attorneys to perform legal services in connection with this Agreement, the Attorney will provide Client with a separate Notice and Consent to Association document which identified the associated counsel and describes the manner in which fees are to be divided among such associated counsel." Reeves did not advise Sampson of her relationship with Hagens Berman in the initial call.

29.    Sampson signed the Attorney Employment Agreement, filled out the questionnaire, and returned it to Reeves.

### SAMPSON & HAGENS BERMAN

30.    On October 25, 2011, Reeves and Hagens Berman filed a complaint on Sampson's behalf in Pennsylvania State Court. That case was removed to this Court on October 27, 2011. Sampson learned that her case had been filed via email from Reeves on October 29, 2011.

31.    Six days after filing a case on her behalf, on October 31, 2011 Sampson received a letter from Reeves "recommending" that she approve an association between Reeves and Hagens Berman. The letter stated that "Our evidentiary case against the Defendants grows stronger by the day. While the statute of limitations continues to pose a very significant hurdle for us, we are making progress." The letter also stated "In order to ensure that this case moves forward aggressively and as quickly as possible…we would also like to recommend to you a change in trial counsel. **The nationally-recognized firm, Hagens Berman Sobol Shapiro, has**

**agreed to act as litigation counsel in these cases, taking the place of the Lanier Law Firm.**" (emphasis in original). The letter continued "Although we have always said that these cases face significant hurdles, the fact that such strong, nationally-recognized firms are willing to represent thalidomide victims in these cases is a very positive sign." *Id.*

32.     Sampson signed the form consenting to the "change" in her representation.

33.     Because Hagens Berman and Reeves filed Sampson's case before she consented to the "change" in representation, Sampson did not have the opportunity to research Hagens Berman, including information involving prior breaches of fiduciary duty to the firm's own clients.

34.     Reeves and Hagens Berman had an attorney-client relationship with Sampson (both before and after the formal retention) and owed her fiduciary duties including loyalty and honesty.

35.     In total, Reeves and Hagens Berman filed dozens of individual cases on behalf of thalidomide victims against the pharmaceutical company defendants. On information and belief, for most of those cases, including Sampson's, Hagens Berman did not personally speak to the individual plaintiff before filing the case, did not review records, and relied exclusively or nearly exclusively on information about the merits of the cases developed by Reeves.

36.     In connection with the filing of the various thalidomide cases (including Sampson's), Hagens Berman issued press releases, at least one promotional video, and solicited and received favorable media coverage of the litigation. This coverage enhanced Hagens Berman's carefully cultivated and promoted reputation as an aggressive law firm willing to take on the toughest cases against some of the largest companies in the world. On information and belief, the widespread media attention enhanced Hagens Berman's

reputation from 2011 through 2014 and increased the law firm's revenue and profitability during this period.

37.    Over the course of the litigation, Sampson received various letters from defendant Berman updating her on, what she believed, were the significant events in the case. For example, a letter from Berman dated September 14, 2012 stated that a thalidomide case in Australia had resulted in a "multi-million-dollar settlement."  That same letter described an apology that Grunenthal issued to the victims of thalidomide. The reported success, albeit in another country, and Grunenthal's public apology provided support for Reeves' initial assessment on the phone that thalidomide victims in "every country" would finally receive compensation and that the pharmaceutical defendants would be forced to account for Sampson's birth injuries.

38.    Shortly after receiving the September 14, 2012 letter from Berman, on October 2, 2012 Sampson lost her job. Unfortunately, the job market at the time was difficult and Sampson was limited to jobs that would not exacerbate her physical pain. Relying on the 18-month timeline provided by Reeves and supported by the description of the Australian settlement and Grunenthal apology from Berman, Sampson opened a small business.

39.    Sampson invested her life savings in this business – in total several hundred thousand dollars. At the time she started the business Sampson justifiably believed, based on the statements from Reeves and Berman, that the case timeline was 18 months and that the "new information" as well as the Australian settlement and Grunenthal apology virtually assured her success in the lawsuit. Sampson believed she could grow the business while waiting for resolution in her thalidomide case. And even if the business did not work out,

proceeds from a verdict or settlement would help to secure her and her family's financial future.

40.     Other letters from Berman also emphasized the chances of winning the case. For example, a letter from Berman dated September 30, 2013 noted that the District Court denied the pharmaceutical company defendants' motion to dismiss based on the statute of limitations. The letter further noted that the pharmaceutical defendants were "shocked" by the ruling.

41.     Individually and collectively, these communications from Berman served to reaffirm Reeves' initial assurance that a victory or settlement was virtually assured, and that Sampson would finally be compensated for her birth injuries.

42.     The last proactive communication that Sampson received from Hagens Berman was on October 27, 2014 asking her to agree to dismiss her claims against GSK while continuing to pursue her claims against the other pharmaceutical defendants. The letter claimed that the reason for the dismissal was that GSK was not involved in the distribution of thalidomide during the time period when Sampson's mother received and ingested thalidomide. The letter also noted that certain sanctions motions had been filed by GSK against Hagens Berman and by Hagens Berman against GSK, and that GSK would withdraw its sanctions request against Hagens Berman in exchange for dismissal.

43.     There were numerous problems with the October 27, 2014 letter. The letter failed to disclose that the time frame of GSK's thalidomide distribution was known by the attorneys prior to filing suit. The letter also failed to disclose that the central legal theory Hagens Berman was pursuing did not depend on which company distributed thalidomide at which time. The letter also failed to disclose that Hagens Berman had recently received

evidence that hundreds of thousands of doses of thalidomide distributed by GSK were unaccounted for and may have been ingested by pregnant women months or even years after their distribution. Hagens Berman also did not disclose to Sampson that it had filed a motion under Fed. R. Civ. P. 56(d) to pursue further discovery in her case against GSK based on this recently received evidence.

44. In addition, the October 27, 2014 letter couched the sanctions motions that were pending against Hagens Berman as a cross-motion for sanctions and failed to disclose the basis for the GSK sanctions motion, *i.e.* that Hagens Berman brought and litigated cases that had no chance of success under the true and available facts and relevant law. The letter failed to provide the context that GSK had been leading the defense of the litigation and that GSK surrendering its ability to recover sanctions against Hagens Berman represented a multi-million-dollar windfall for the law firm while the thalidomide plaintiffs would receive nothing.

45. The October 27, 2014 letter also misleadingly stated that there were "compelling strategic advantages," in the view of Hagens Berman, to dismissing GSK and "continuing against the other defendants."

46. Finally, the October 27, 2014 letter failed to disclose that the Court had recently entered a summary judgment order relevant to the viability of many plaintiffs' claims. The October 27, 2014 letter did not advise Sampson of the relevance of that summary judgment decision to her case and, in fact, did not mention it at all.

47. On information and belief, substantially the same letter was sent to numerous other thalidomide plaintiffs. On further information and belief, the letter was written, approved, and/or authorized by Berman personally.

**THE SPECIAL DISCOVERY MASTER'S INVESTIGATION**

48.     Upon learning that numerous plaintiffs had agreed to dismiss their claims against GSK in exchange for no compensation despite the Hagens Berman firm avoiding potentially significant sanctions, the District Court assigned the Special Discovery Master to investigate whether the requested dismissals were knowing and voluntary. The investigation began in 2015. The Special Discovery Master's investigation continues to this day and has grown in scope to include issues of the adequacy of the defendants' pre-suit investigation, falsification of evidence, the applicability of the crime-fraud exception to the attorney-client privilege, and other related matters.

49.     During the investigation in 2016, Sampson wrote a letter directly to Berman requesting an explanation of why her case had continued for many years longer than the original 18 months she expected. Berman wrote back explaining in detail that the firm was continuing to aggressively pursue the litigation and was seeking justice for victims of thalidomide. This letter renewed Sampson's trust that Hagens Berman had the best interests of the thalidomide plaintiffs (including Sampson) at heart and that there was little Hagens Berman could do to compel a decision in her case.

**SAMPSON DISCOVERS THE TRUTH**

50.     Over the course of the underlying thalidomide litigation, Hagens Berman attorneys misleadingly and inaccurately informed Sampson by email and by phone that they were unsure of the reason for the delay in resolving her cases, that they had never seen anything like the tactics employed by the District Court and Special Discovery Master, and that the Special Discovery Master was acting beyond his authority.

51.     These statements were either untrue or incomplete and did not include available information necessary to make the statements not misleading. The uncertainty

surrounding resolution of Sampson's case coupled with the failure of the small business she started in 2012 in reliance on Reeves' assurance (bolstered by the Berman letters) that the case would be resolved favorably in 18 months, caused Sampson mental distress that manifested itself with physical symptoms including anxiety, depression, suicidal ideation, insomnia, exacerbation of her physical pain, and at least one visit to a hospital emergency room relating to her depression, anxiety, and suicidal ideation.

52.     Sampson had no significant reason to doubt the information she received from Reeves or the communications from various Hagens Berman attorneys over the years. She continued to believe that the problem with the case was an unknown delay on the part of the District Court and Special Discovery Master.

53.     In mid-May 2018, a Google news alert pointed Sampson to an article published by Law360 about a Hagens Berman attorney that falsified an expert report to convince one of the other thalidomide plaintiffs to voluntarily dismiss her lawsuit against the pharmaceutical defendants. On information and belief, the falsified expert report only came to light as a result of the Special Discovery Master's investigation.

54.     On or about May 21, 2018 Sampson requested an update on her case from a Hagens Berman partner. Soon afterward, Sampson spoke to two Hagens Berman attorneys on a conference call. One of the Hagens Berman attorneys restated the, by then familiar, line that the District Court had still not ruled on her case and they were not sure why. Sampson informed the attorneys that she was now aware of the allegations involving the falsified expert report and the investigation into the conduct of Hagens Berman and Reeves by the Special Discovery Master. The Hagens Berman attorney responded, "Oh, no wonder you don't trust us. We thought those documents were sealed."

55.     From mid-May 2018 through mid-2019 Sampson spent countless hours and thousands of dollars out-of-pocket obtaining, reading, and organizing docket materials and other documents that had never been sent to her involving the underlying thalidomide litigation and  flew to Philadelphia at her own expense to share her experiences as a plaintiff in the underlying pharmaceutical litigation with the Special Discovery Master.

56.     After nearly a decade of uncertainty and anxiety about the outcome of her case against the pharmaceutical company defendants in the underlying thalidomide litigation, Sampson is now aware that her own lawyers had been providing her with misleading, incomplete, and false information about her case and her prospects for recovery.

### COUNT I: BREACH OF FIDUCIARY DUTY

57.     Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

58.     All defendants acted as counsel for plaintiff and owed her fiduciary duties of honesty and undivided loyalty.

59.     Each of the defendants breached their fiduciary duty of honesty and loyalty by at least:

- Providing to plaintiff information that was either false, misleading, or insufficiently complete to prevent the information from being interpreted in a manner that was false and misleading;

- Acting in a manner than materially benefited the financial or other interests of the attorney defendants rather than the plaintiff to whom they owed fiduciary duties;

- Reserving for themselves publicity and reputation benefits from the claim that they were advancing the interests of thalidomide victims, including the plaintiff.

60. Plaintiff has been damaged because she acted or failed to act in reliance on the false, misleading, and/or incomplete information provided by the defendants.

61. The defendants' publicity, reputation, and financial interests have been advanced through their breaches of their fiduciary duties to the plaintiff.

62. Plaintiff is entitled to recover both for her damages to her mental, physical, and financial health and the unjust and inequitable benefit received by each of the defendants as a result of their breaches of fiduciary duty.

**COUNT II: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

63. Plaintiff incorporates paragraphs 1-62 as if fully set forth herein.

64. Plaintiff had a special, confidential, contractual, and fiduciary relationship with each defendant as each defendant represented her in connection with her claim against manufacturers and distributors of thalidomide reflected in the case *Johnson v. SmithKline Beecham et al.*, Case No. 2:11-cv-05782-PD.

65. Defendants' negligent, reckless, and intentional false and misleading statements to plaintiff foreseeably caused plaintiff extreme emotional harm exceeding that which a reasonable person should be expected to endure. That distress manifested itself with physical symptoms including, without limitation, insomnia, anxiety, depression, and suicidal ideation.

66.     Plaintiff is entitled to recover for the damage to her mental and physical health as a result of each defendants' negligent, reckless, and intentional false and misleading statements.

### COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

67.     Plaintiff incorporates paragraphs 1-66 as if fully set forth herein.

68.     Plaintiff had a special, confidential, contractual, and fiduciary relationship with each defendant as each defendant represented her in connection with her claim against manufacturers and distributors of thalidomide reflected in the case *Johnson v. SmithKline Beecham et al.*, Case No. 2:11-cv-05782-PD.

69.     Defendants' reckless and intentional false and misleading statements to plaintiff were extreme and outrageous according to the fiduciary obligations each defendant owed plaintiff.

70.     Defendant's false and misleading statements caused plaintiff severe and extreme emotional harm. That distress included physical manifestations including, without limitation, exacerbation of her physical pain, insomnia, anxiety, depression, and suicidal ideation.

71.     Plaintiff is entitled to recover for the damage to her mental and physical health as a result of each defendants' reckless and intentional false and misleading statements.

### COUNT IV: FRAUD/FRAUDULENT NONDISCLOSURE

72.     Plaintiff incorporates paragraphs 1-71 as if fully set forth herein.

73.     Reeves had fiduciary duties to plaintiff during the course of her phone call with plaintiff on or about September 27, 2011. Reeves phone conversation with plaintiff on or about September 27, 2011 involved several statements of fact. The statements included:

- That the litigation would be resolved within 18 months;

- That negative publicity from the litigation would force the pharmaceutical companies to pay a financial settlement to the plaintiffs;

- That Peter Gordon would play a leadership role in the U.S. thalidomide litigation;

- That plaintiff's attorney's failure to ascertain the source of her birth injuries decades earlier supported her claim,

74.     The above statements were either false or did not include sufficient information to make the statements not misleading. Information that was not disclosed included:

- That the 18-month timeline would only be me if the pharmaceutical defendants chose not to aggressively defend the case;

- That the pharmaceutical defendants had a history of defending prior thalidomide litigation aggressively;

- That Peter Gordon was an Australian attorney and could not act as trial counsel in the United States;

- That the fact that plaintiff suspected that she was a victim of thalidomide could harm her claim that the statute of limitations should not apply to her case.

75.     Reeves intended that plaintiff act in reliance on her false, misleading, and/or incomplete statements, namely that plaintiff would retain Reeves as counsel and become a plaintiff in thalidomide litigation in the United States.

76.     Despite having fiduciary duties to plaintiff, when Hagens Berman and Berman took over as counsel for plaintiff, they failed to provide sufficient information to plaintiff to correct Reeves' false, misleading, and/or incomplete statements. In fact, they compounded

the false, misleading, and/or incomplete information with letters that continued to tell a happy story about plaintiff's prospects in litigation. Those statements included a letter from Berman dated September 14, 2012 which pointed to a "multi-million-dollar settlement" in Australia and a public apology from Grunenthal to international victims of thalidomide.

77.     Plaintiff acted in reliance on Reeves false, misleading, and/or incomplete statements by at least the following:

- Agreeing to join a lawsuit against the pharmaceutical defendants as a plaintiff;
- Agreeing to representation by Reeves;
- Agreeing to the disclosure of her confidential medical, financial, and other information;
- Investing her life savings in a small business.

78.     Plaintiff has suffered damage through at least the following:

- Disclosure of confidential and protected information in litigation;
- Loss of her life savings;
- Emotional distress from participation in the litigation and defendants' repeated breaches of fiduciary duty as set forth throughout this complaint.

## COUNT V: BREACH OF CONTRACT/BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

79.     Plaintiff incorporates paragraphs 1-78 as if fully set forth herein.

80.     Plaintiff entered into a contract for legal services with the law firm Gordon & Reeves in October 2011.

81.     In late 2011, plaintiff executed a Client Consent Form for the Co-Counsel/Fee Sharing Agreement between Gordon & Reeves LLP and Hagens Berman Sobol Shapiro LLP.

82.     Hagens Berman has evaded the spirit of the bargain with plaintiff by providing her with false, misleading, and/or incomplete information about, at least, the status of her claim and the reasons for delay in resolving her claim.

83.     Hagens Berman has failed to cooperate with plaintiff's performance of her right to good faith representation by failing to advise her honestly and fairly about the GSK dismissal, her likelihood of success, and the length and difficulty of her claim.

84.     Hagens Berman's breach of contract and/or the covenant of good faith and fair dealing has been intentional and/or reckless and has damaged plaintiff.

## COUNT VI: CIVIL CONSPIRACY/CONCERTED ACTION (ALL DEFENDANTS)

85.     Plaintiff incorporates paragraphs 1-84 as if fully set forth herein.

86.     On information and belief, Reeves acted as a "runner," *i.e.* an attorney that recruits clients for litigation on behalf of other law firms. Reeves and Hagens Berman entered into an agreement whereby Hagens Berman paid Reeves to recruit thalidomide survivors as plaintiffs and hand the cases off to lead counsel for litigation.

87.     Hagens Berman relied on Reeves and did not undertake an independent investigation of plaintiff's claim or the false, misleading, or incomplete representations made by Reeves to plaintiff. Hagens Berman further co-counseled with Reeves in plaintiff's case against the pharmaceutical defendants.

88.     Defendants filed a lawsuit on behalf of plaintiff without providing her an honest, accurate, and fair assessment of her likelihood of success. Defendants also jointly conspired to intentionally, maliciously, and/or recklessly provide her with false and misleading information about her case and prospects for success. Defendants deprived plaintiff of a fair opportunity to choose whether to undertake litigation and further provided

false or misleading information intentionally, maliciously, or recklessly that she relied on. Hagens Berman, Steve Berman, and Kay Reeves, acted in concert to breach their fiduciary duties to plaintiff to plaintiff's harm and/or defendants' benefit.

## PRAYER FOR RELIEF

Plaintiff prays for relief as follows:

1. past, present, and future economic damages in connection with defendants' breaches of fiduciary duty including financial losses suffered by plaintiff in reliance on false, incomplete, and misleading information provided to plaintiff in breach of defendants' fiduciary duties;

2. compensatory damages, according to proof, including damages for pain and suffering, mental anguish, emotional distress, embarrassment, shame, anguish, anxiety, and loss of enjoyment of life, along with past, present, and future special damages;

3. general damages in the amount to be determined for the wrongful conduct of the defendants;

4. equitable relief including at least the disgorgement or restitution to plaintiff of all benefits or prospective benefits received by the defendants as a result of their breaches of fiduciary duty;

5. reasonable costs, including any attorneys' fees permitted by law;

6. prejudgment and post-judgment interest as provided by law;

7. punitive damages based on the character of the acts and omissions of the defendants, the nature and extent of the harm, and the wealth of the defendants; and

8. such further relief as allowed by law.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims set forth herein.

Dated: May 11, 2020

Respectfully submitted,

/s/ Matthew B. Weisberg
Matthew Weisberg
Weisberg Law
7 S. Morton Ave.
Morton, PA 19070
mweisberg@weisberglawoffices.com

Nicholas S. Boebel (*pro hac vice* to be filed)
**Hansen Reynolds LLC**
225 South Sixth Street, Suite 3900
Minneapolis, MN 55402
Telephone: (206) 268-9320
nboebel@hansenreynolds.com