## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROLYN SAMPSON, | No. 2:20-cv-02232 PD |
|                  Plaintiff, | |
| v. | |
| HAGENS BERMAN SOBOL SHAPIRO LLP; KAY GUNDERSON REEVES; STEVE W. BERMAN, | |
|                  Defendants. | |

## COMBINED RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT
## AND
## REPLY IN SUPPORT OF MOTION TO DISMISS

Defendants Hagens Berman Sobol Shapiro LLP and Steve W. Berman (collectively, "the Hagens Berman Defendants") submit this Combined Response to Plaintiff's Motion for Leave to File First Amended Complaint and Reply in support of its Motion to Dismiss under Rule 12(b)(6).

The Motion for Leave to Amend should be denied because the amendment would be futile for its stated purpose—providing support for the conspiracy claim. [Doc 48-1, 5.] Moreover, the proposed amendments come too late, as discovery closed on September 10, 2020 and summary judgment motions are due in less than two weeks. Finally, the amendment is unnecessary, as the relatively few factual allegations added are drawn from documents produced in the case, and to the extent Plaintiff's claims survive the pending Rule 12(b)(6) motion that evidence would be

available to Plaintiff at trial.  The Hagens Berman Defendants have no objection to the dismissal of Count IV (fraud) and Count V (breach of contract/duty of good faith and fair dealing), and indeed their Rule 12 motion seeks precisely that relief.  But it is too late and unnecessary for the Complaint to be amended.

With the dismissal of her fraud and contract claims, Plaintiff is left with claims for negligent infliction of emotional distress ("NIED"), intentional infliction of emotional distress ("IIED"), and conspiracy.

As for her response to the Rule 12(b)(6) motion on her remaining claims Sampson incorrectly asserts that Pennsylvania law governs (despite the lack of any Pennsylvania resident impacted by this action), and does not dispute that the punitive damages, NIED, and IIED claims fail as a matter of law under the applicable Minnesota or Washington law.  In addition, the NIED, IIED, and conspiracy claims fail under Pennsylvania law.  Finally, the First Amended Complaint does not address the statute of limitations bar with regard to the breach of fiduciary duty claim to the extent it is based on Plaintiff's allegation that the Hagens Berman Defendants affirmed or adopted any statement by Ms. Reeves that Ms. Sampson's thalidomide claims would be resolved within 18 months of October 2011. Thus, the Hagens Berman Defendants Motion to Dismiss should be granted.

## I.  Argument

### A.  Minnesota or Washington law governs the punitive damages claim, and there is no dispute that the claim fails under both laws.

Sampson implicitly concedes that if either Washington or Minnesota law applies to the claim for punitive damages, then the punitive damages claim fails as a matter of law.  Sampson's argument in support of her punitive damages claim relies solely on the application of Pennsylvania law.

As Sampson acknowledges, there is a true conflict here and the state with the greater interest in having its punitive damages law applied will govern. *Kukoly v. World Factory, Inc*., No. CIV A 07-01644, 2007 WL 1816476, at *3 (E.D. Pa. June 22, 2007).  Sampson also agrees that the relevant contacts for the purpose of selecting the state with the greatest interest include "the place of injury, place of conduct, domicile of the parties, and the place where the relationship between the parties is centered." *Id*.

Sampson asserts that two of these four contacts point to Pennsylvania, the purported place of the tortious conduct and where the parties' relationship is centered.  She further argues that Pennsylvania has the greatest interest in applying its punitive damages law to "punish the use and abuse of its Courts as a vehicle to harm litigants." [Doc 48-1, 13.]  Surprisingly, Sampson argues that Pennsylvania's interest is greater because "Sampson's residence in Minnesota is largely incidental." [Doc. 48-1 at 13.]

Plaintiff's argument fails because both Washington and Minnesota have a greater interest than Pennsylvania in applying their punitive damages law. First, Washington has a greater interest because Washington is where the Hagens Berman Defendants made the alleged misrepresentations and where they reside. Second, Minnesota also has a greater interest as Sampson's domicile and undisputed place of injury. Sampson's long-term connection to Minnesota is not incidental or fortuitous and remains "entitled to considerable weight." *Bearden v. Wyeth*, 482 F. Supp. 2d 614, 620 (E.D. Pa. 2006).

First, Washington has more relevant contacts and a greater interest in the application of its punitive damages law to its residents, Steve Berman and Hagens Berman. The purpose of punitive damages is to punish and deter outrageous conduct, so the most relevant contacts are the defendants' domicile as well as the place of the tortious conduct. *See, e.g.*, *Campbell v. Fawber*, 975 F. Supp. 2d 485, 508 (M.D. Pa. 2013). Here, there is no dispute that Steve Berman is a Washington resident and that Hagens Berman has its principal place of business in Washington and is domiciled there.

Additionally, Washington was the place of the Hagens Berman Defendant's alleged tortious conduct. The tortious conduct upon which Sampson's punitive

damages claims relies are the alleged misrepresentations by the Hagens Berman Defendants to Sampson.[1] [*See, e.g.*, First Amended Complaint "FAC" ¶ 73-75]

The letters and emails containing the alleged misrepresentations emanated from Washington, so the place of the alleged tortious conduct is Washington. Restatement (Second) of Conflict of Laws § 148 (when tortious conduct at issue is a misrepresentation, "the place where the defendants made the alleged misrepresentation" is the relevant inquiry); *Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677, 700 (W.D. Pa. 2013) (finding conduct giving rise to the alleged torts took place in Pennsylvania, where defendant was incorporated); *Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719, 733, 734 (D. Del. 2015) (finding that alleged misrepresentations were made in Pennsylvania and New York, where counsel were located); *Bryant v. Wyeth*, 879 F. Supp. 2d 1214, 1224 (W.D. Wash. 2012) (finding Pennsylvania law applied to punitive damages claim when "the bulk of the conduct at issue is the extensive fraudulent misrepresentations allegedly made from Wyeth's Pennsylvania headquarters" and Wyeth "disseminated this

---

[1] All of Sampson's claims rely on the central allegations that: (1) before filing suit Reeves told her that the lawsuit would be successful and concluded within 18 months of filing, (2) Hagens Berman reaffirmed these predictions in communications with Sampson; and (3) Hagens Berman provided inaccurate or incomplete information about why the case was proceeding slowly and whether she should dismiss her claim against one of the defendants, GlaxoSmithKline.

information from Pennsylvania, centering the parties' relationship there for the issue of punitive damages").

Because Sampson's punitive damages claim relies on alleged misrepresentations made by the Hagens Berman Defendants in Washington to Sampson in Minnesota, "it is irrelevant where the underlying suit was originally being litigated, [and] where the acts in the underlying litigation occurred[.]" *Teva Pharm. Indus., Ltd. v. United Healthcare Services, Inc.*, 341 F. Supp. 3d 475, 505–06 (E.D. Pa. 2018), *appeal dismissed sub nom. Teva Pharm. Indus. v. United Healthcare Services Inc.*, 18-3610, 2019 WL 2385192 (3d Cir. Jan. 25, 2019) (finding state where underlying litigation occurred irrelevant to dispute regarding enforceability of a settlement agreement). While the FAC includes additional allegations regarding the filing of Sampson's thalidomide complaint without individualized fraudulent concealment or equitable tolling allegations, the FAC does not rely on this claim to establish entitlement to punitive damages. Unlike the willful and malicious allegations at paragraphs 75 and 91, there is no allegation that the Hagens Berman Defendants relied on a template in a class action lawsuit out of malice or a carelessness displaying a wanton disregard for the safety of others.

For these same reasons, the Plaintiff's argument that the relationship between the parties was centered in Pennsylvania because the underlying litigation occurred in a Pennsylvania court fails. The alleged misrepresentations were made from the

Hagens Berman Defendants in Washington to Sampson in Minnesota. Plaintiff received and relied upon the alleged misrepresentations in Minnesota, not Pennsylvania. The fact that the Joint Prosecution Agreement (to which Plaintiff was not a party and had no knowledge of) contemplated filing litigation in a Pennsylvania court is inconsequential when neither the Joint Prosecution Agreement nor the Pennsylvania litigation form the basis of Plaintiff's punitive damages claim. The relationship between the parties was not centered in one particular state, so this factor cannot establish that Pennsylvania has the most substantial connection and interest in applying its state law.

Washington has a strong interest in "'seeing that its domiciliary defendants are protected from excessive financial liability,' in order that it may induce firms to conduct business within its borders." *Campbell v. Fawber*, 975 F. Supp. 2d 485, 508 (M.D. Pa. 2013). By strictly limiting punitive damages, Washington "may indeed induce other businesses to enter the state with the assurance that, although responsible for its own torts, a company shall be immune from excessive financial liability." *In re Disaster at Detroit Metro. Airport on Aug. 16, 1987*, 750 F. Supp. 793, 807 (E.D. Mich. 1989); *In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979* ("*Chicago*")*,* 644 F.2d 594, 614 (7th Cir. 1981). Washington has a greater interest in the application of its punitive damages law with regard to its Washington residents than does Pennsylvania, which is neither the place of tortious conduct, the

place where the parties' relationship was centered, nor the place of any party's domicile.

Second, Minnesota also has a greater interest in applying its law than Pennsylvania. Minnesota is the where Sampson lives, where Sampson received and purportedly relied on the alleged misrepresentations forming the basis of her claims (by, among other things, investing in a business there and filing bankruptcy there). It is the place where Sampson experienced the alleged harm. [Doc 48-1, 9.]

Pennsylvania courts have routinely found that a state with these contacts has the greater interest in having its punitive damages law applied. *Wolfe v. McNeil-PPC, Inc.*, 703 F. Supp. 2d 487, 494 (E.D. Pa. 2010) (concluding that the state with the greater interest in having its punitive damages law applied was the state where the plaintiff lived at the time of her alleged injury, where the injury initially occurred, and the place where plaintiff relied on the defendants' alleged representations); *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 602, 614, 637 (E.D. Pa. 2008) (finding New Jersey law governed punitive damages claim when it was the state where the victim allegedly experienced the injury and where the defendants directed their alleged representations).

Despite seeking punitive damages based on conduct she experienced and relied on in her home state of Minnesota, Sampson attempts to minimize the connection with her home state by asserting that "Sampson's residence in Minnesota

is largely incidental. Thalidomide litigants across the United States likely experienced harm similar to her own." [Doc. 48-1 at 13.] But Sampson has been a long-term resident of Minnesota, and her alleged injury in Minnesota is not incidental or fortuitous. *Bearden v. Wyeth*, 482 F. Supp. 2d 614, 620 (E.D. Pa. 2006) (contrasting fortuitous place of injury when dispute arises out of an airplane crash). Additionally, Sampson seeks punitive damages based on her own individual claimst and injuries, not other people's. In determining which state has the greater interest in applying its laws, Sampson's alleged injury in her home state of Minnesota remains "entitled to considerable weight." *Bearden v. Wyeth*, 482 F. Supp. 2d 614, 620 (E.D. Pa. 2006).

Minnesota has an interest in applying its punitive damages law to protect its residents and deter outrageous conduct, while ensuring that its residents are not subject to unmeritorious punitive damages claims. Minnesota Statutes § 549.191 was intended "to prevent frivolous punitive damage claims by allowing a court to determine first if punitive damages are appropriate." *Gamma–10 Plastics, Inc. v. Am. President Lines, Ltd*., 32 F.3d 1244, 1255 (8th Cir. 1994); *Ulrich v. City of Crosby*, 848 F. Supp. 861, 866–67 (D. Minn. 1994).

Plaintiff argues (at 12) that applying Pennsylvania law on punitive damages would not undermine Minnesota's public policy because (1) Pennsylvania only awards punitive damages claim if compensatory damages are warranted and (2) both

Pennsylvania and Minnesota recognize that breach of fiduciary duty can give rise to punitive damages. But Minnesota's statutory limitation on punitive damages imposes limitations beyond requiring an award of compensatory damages on a breach of fiduciary duty claim and would be undermined by the application of Pennsylvania law. Minnesota has a greater interest than Pennsylvania in applying its punitive damages law.

### B.    Minnesota law governs the emotional distress claims.

With regard to the emotional distress claims, the only dispute is whether Minnesota or Pennsylvania has more relevant contacts and a greater interest in applying its substantive laws. Sampson admits that Minnesota has two of the four relevant contacts (place of domicile and injury) and an interest in applying its law with regard to its residents who experienced alleged harm in its state. However, Sampson asserts that Pennsylvania has a greater interest governing the relationship between a Washington attorney and Minnesota client because (1) all of the claims "arise out of the defendants' conduct in connection with the litigation venued in Pennsylvania," and (2) the relationship between Sampson and the Hagens Berman Defendants was purportedly centered in Pennsylvania. [Doc 48-1, 9-10.]

First, Sampson's argument fails because Pennsylvania was neither the place where the conduct causing the alleged emotional distress occurred nor the place where the relationship between the parties was centered. As explained above, the

representations forming the basis of the emotional distress claims from Washington, so the place of the alleged tortious conduct is Washington. [FAC ¶ 80 ("Defendants' negligent, reckless, and intentional false and misleading statements and omissions to plaintiff . . . foreseeably caused plaintiff extreme emotional harm"); FAC ¶ 85 ("Defendants' reckless and intentional false and misleading statements to plaintiff were extreme and outrageous").] Sampson's emphasis on the connection to the Pennsylvania thalidomide litigation and the Joint Prosecution Agreement between the attorneys bringing that litigation (not Sampson) is misplaced.

<u>Second</u>, as the Hagens Berman Defendants explained in their Motion to Dismiss, none of six factors set forth in the Restatement (Second) of Conflict of Laws § 148 governing the conflict of law analysis for torts based on misrepresentations weigh in favor of the application of Pennsylvania law. Three of these factors favor the application of Minnesota law: (1) the place where Sampson allegedly acted in reliance upon the representations, (2) the place where Sampson received the representations, and (3) the place where Sampson resides and was injured. One of the factors favors the application of Washington law: (4) the place where the defendants made the alleged misrepresentations. Two factors are inapplicable: (5) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (6) the place where the plaintiff is to render performance under a contract which he has been induced to

enter by false representations. Sampson failed to address this argument, implicitly conceding that none of these factors support the application of Pennsylvania law.

Third, even if the alleged tortious conduct complained of by Sampson occurred in Pennsylvania (and it did not), the place where Sampson resides and felt the alleged harm is entitled to more weight in determining which state law governs her tort claims. Comment e to Section 145 explains that the place of the tortious conduct is usually significant only if the state where the injury occurred either cannot be determined or bears little relation to the parties. Restatement (Second) of Conflict of Laws § 145 cmt. e.

In addition, and importantly, Pennsylvania courts find that the place where a plaintiff resides and felt the alleged harm is entitled to more weight than the place of the tortious conduct. *Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677, 700 (W.D. Pa. 2013) ("Although the conduct giving rise to the alleged torts took place in Pennsylvania and the Kasgro Defendants reside here, the place where [plaintiff resides] and the harm was felt is more significant for this analysis."); *Bearden v. Wyeth*, 482 F. Supp. 2d 614, 620 (E.D. Pa. 2006) (noting that Pennsylvania state courts and federal courts applying Pennsylvania choice of law principles have refused to apply Pennsylvania substantive law when it was not the place of injury, which is entitled to considerable weight); *Shields v. Consolidated Rail Corp.*, 810 F.2d 397, 401 (3d Cir. 1987) ("where the place where the injury

occurred was not fortuitous . . . the place of injury assumes much greater importance, and in some instances may be determinative"). These decisions are consistent with the established principle that "the local law of the state of injury will usually be applied to determine most issues involving the tort" when the "injured person has a settled relationship to that state, either because he is domiciled or resides there. . . ." Restatement (Second) of Conflict of Laws § 146 cmt. e.

Fourth, considering Pennsylvania's limited connection to Sampson's emotional distress claims, Minnesota's undisputed interest in protecting its own residents from harm is greater than Pennsylvania's alleged interest in regulating the attorney/client relationship between non-residents (especially where, as here, the parties agreed to venue in Texas and to a Texas choice-of-law provision). In addition to Minnesota's interest in prescribing the rules ensuring that its residents receive compensation for their injuries, Minnesota also has an interest in enforcing its tort laws in a manner that encourages economic activity and lowers costs for resident consumers and businesses. *LeJeune v. Bliss-Salem, Inc*., 85 F.3d 1069, 1072 (3d Cir. 1996) ("A state's interest in enforcing its tort law is not constrained to protecting residents from harm or suit. A state could have a host of reasons for limiting liability, including encouraging economic activity in the state . . . and lowering costs to consumers . . ."). In addition, Pennsylvania courts have recognized that Minnesota has an interest in regulating the conduct of attorneys representing its residents. *Teva*

*Pharm. Indus., Ltd.*, 341 F. Supp. 3d at 507 ("Minnesota clearly has an interest in regulating . . . the representatives its citizens hire.").

In contrast, Pennsylvania courts have rejected Sampson's argument that Pennsylvania has an interest in protecting non-resident "litigants in its Courts from harm[.]" [Doc 48-1, 10-11 (citing *Crossland Savings FSB v. Rockwood Ins. Co.*, 692 F. Supp. 1510, 1512 (S.D.N.Y. 1988)).] In *Teva Pharmaceutical Industries, Ltd.*, this District found that the state of Pennsylvania had no interest in regulating the conduct of non-resident attorneys with regard to their non-resident clients. 341 F. Supp. 3d at 507 (in choice-of-law context, "Pennsylvania has no interest in regulating the attorney-client relationship of a citizen of another state.").

Sampson reliance on *Crossland Savings FSB v. Rockwood Insurance Company* underscores the absence of authority to support her position. Sampson cites *Crossland Savings* in support of her assertion that Pennsylvania's interest in regulating non-resident attorneys who practice in its courts outweighs Minnesota's interest in regulating business relationships with its residents. [Doc 48-1, 11.] But that court found that New York's interest outweighed Texas's interest in regulating its licensed professional because (1) the plaintiff resided in New York and (2) the defendants made the alleged misrepresentations in New York. 692 F. Supp. at 1512. The *Crossland Savings* decision supports the conclusion that Minnesota's interest in

applying its law is greater here because Sampson resides in Minnesota and felt the alleged injury in Minnesota.

Minnesota law limiting emotional distress claims "reflects a policy consideration that an independent claim of mental anguish is speculative and so likely to lead to fictitious allegations that there is a considerable potential for abuse of the judicial process." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438 (Minn. 1983); *Stadler v. Cross*, 295 N.W.2d 552, 554 (Minn. 1980) (affirming zone of danger limitation to ensure that there are "workable, reasonable, logical, and just as possible" limitations to the consequences of a person's actions). Minnesota has a greater interest in applying its state laws based on policy consideration to claims brought by a resident of its state who was harmed in its state than Pennsylvania.

## C.     The NIED claim fails under Minnesota and Pennsylvania law.

There is no dispute that Sampson's NIED claim fails under Minnesota law. [Doc 48-1, 13-14.] That claim must be dismissed because there is no allegation that Plaintiff was within the zone of physical danger and feared for her own safety, two necessary elements of an NIED claim under Minnesota law. *See Engler v. Ill. Farmers Ins. Co*., 706 N.W.2d 764, 767 (Minn. 2005).

Although Minnesota law applies for the reasons set out above, the NIED claim also fails under Pennsylvania law. Sampson asserts that Pennsylvania law "allows a claim for negligent infliction of emotion distress claim [outside the zone of danger]

where the defendant owes the plaintiff a fiduciary duty." [*Id.* at 13-14 (citing *Toney v. Chester Co. Hosp.*, 961 A.2d 192, 197-98 (Pa. Super. 2008)).] But Pennsylvania law limits the fiduciary relationships supporting a NIED claim to those that "encompass an implied duty to care for the plaintiff's emotional well-being" where "deep emotional harm" is an obviously foreseeable risk, which does not include attorney/client relationships. *Toney*, 36 A.3d at 85; *MDB*, 386 F. Supp. 3d at 593 (finding that a school was not "responsible for the care of the feelings of a child" and that the relationship between a school and student "was simply not of the intensely emotionally charged sort . . . giving rise to a duty not to negligently inflict emotional distress").

In *Toney*, the plaintiff mother brought a NIED claim against her obstetricians, who told her that her ultrasound results were normal when her child actually had "several profound physical deformities." *Toney*, 36 A.3d at 85.[2] In allowing the mother's NIED claim to move forward, the opinion explicitly "limit[ed] the reach of this NIED claim to preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach[.]" *Id.* The opinion explained that these "special relationships must encompass an implied duty to care for the plaintiff's emotional well-being." *Id.* at 95. The opinion noted

---

[2] As a threshold issue, Sampson omits that the *Toney* opinion lacks precedential value because the Pennsylvania Supreme Court was evenly divided. *MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 593 (W.D. Pa. 2019).

that "not all breaches of duties should result in compensable emotional distress claims," including not all doctor-patient relationships. *Id*. at 91. Rather, those "relationships involving life and death fall within this category." *Id*. at 95. The opinion found that the doctor-patient relationship in the "sensitive and emotionally charged field of obstetrics" qualified because it included a duty to care for their patient's emotional well-being when diagnosing fetal abnormalities and deep emotional harm due to a breach was foreseeable. *Id*.

Since *Toney*, Pennsylvania courts have declined to extend NIED liability beyond the limited doctor/patient relationships (such as the obstetrician/patient relationship at issue in *Toney*), and one adoption agency/adoptive parents relationship. *MDB*, 386 F. Supp. 3d at 593 (citing *Hershman v. Muhlenberg Coll*., 17 F. Supp. 3d 454, 460 n.8 (E.D. Pa. 2014) (collecting cases and explaining that Pennsylvania courts have not found a special relationship in cases involving, inter alia, employer-employee, lender-borrower, casino-patron, airline-passenger, or contractor-building-owner relationships)).

Here, the relationship between an attorney and client does not "encompass an implied duty to care for the plaintiff's emotional well-being" that is greater than a school's duty to care for the emotional well-being of a child. *Toney*, 36 A.3d at 85; *MDB*, 386 F. Supp. 3d at 593. While involvement in litigation is generally stressful, it is "not of the intensely emotionally charged sort where courts have recognized a

'special relationship' giving rise to a duty not to negligently inflict emotional distress." *Id*. Additionally, an attorney's knowledge that litigation is stressful for a client does not turn litigation into a "life and death" situation and does not make it "obviously and objectively" foreseeable that there was a "potential of deep emotional harm in the event of breach." *Id*.; *see also Ordon v. Karpie*, 273 Fed. App'x 27 (2d Cir. 2008) (finding insufficient allegations supporting NIED claim based on attorney's advice to settle medical examining board complaint without informing him of the risk of reciprocal discipline by other medical boards when alleged failure did not create an unreasonable risk of foreseeable emotional distress). The FAC lacks allegations of a zone of danger or special relationship necessary to bringing a NIED claim, and the NIED claim fails under Minnesota and Pennsylvania law.

### D.    The IIED claim fails under Minnesota and Pennsylvania law.

Sampson also does not dispute that her IIED claim fails under Minnesota law, and for that reason alone the claim should be dismissed.

Instead, Plaintiff argues that Pennsylvania law applies, and that the claim states a claim for relief under Pennsylvania law, which relaxes the required standard for extreme and outrageous conduct when a "special relationship" is in place. However, Sampson relies only on *Bradshaw* and *Fair*, neither of which holds that an attorney-client relationship permits a plaintiff to state a claim for IIED without

alleging extreme and outrageous conduct. Even if Pennsylvania law applies to the IIED claim, the proposed amended claim in the FAC fails to state a claim.

In *Bradshaw*, the court noted two instances where a special relationship relaxed the extreme and outrageous standard: a father/son relationship and landlord/tenant relationship. The court did not include the attorney/client relationship within this limited group of special relationships, rather it noted that "[t]hreats of foreclosure by a law firm where such action was of doubtful legality did not meet the test" for extreme and outrageous conduct. *Bradshaw v. Gen. Motors Corp., Fisher Body Div*., 805 F.2d 110, 114 (3d Cir. 1986), *abrogated by Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820 (1990). The court confirmed that Pennsylvania "has placed substantial restrictions on this cause of action" and that it was reserved for "bizarre and gruesome" situations like where the defendants killed the plaintiff's minor son, secretly buried the body, and concealed the death without notifying the authorities for months. *Id.* (citing *Papieves v. Kelly*, 437 Pa. 373, 263 A.2d 118 (1970)). The court concluded that the employer/employee relationship was not one of the limited "special relationships" and that plaintiff failed to state a claim for NIED based on allegations that the defendants misled him as to the chances for being rehired. *Id.*

In *Fair*, the court concluded that a landlord's "extreme abuse of their position" could constitute "extreme and outrageous" conduct in circumstances where the

landlord refused to make the premises fit for human habitation. *Fair v. Negley*, 390 A.2d 240, 242 (Pa. Super. 1978). The court did not address special relationships and those facts were far more extreme and outrageous than the facts alleged in the FAC.

> The Restatement narrowly limits the special relationship:
>
> A common carrier or other public utility is subject to liability to patrons utilizing its facilities for gross insults which reasonably offend them, inflicted by the utility's servants while otherwise acting within the scope of their employment.

Restatement (Second) of Torts § 48 (1965). *See also Eck v. Oley Valley Sch. Dist.*, No. CV 19-1873, 2019 WL 3842399, at *9 (E.D. Pa. Aug. 15, 2019) (concluding that exception in section 48 did not apply to special teacher-student relationship, and that IIED claim failed to state a claim). Defendants are not a common carrier or public utility, and Pennsylvania law does not relax the requirement to allege "extreme and outrageous" conduct in order to state a claim for IIED against one's lawyer.

Plaintiff's argument relies on the application of a relaxed standard, implicitly acknowledging that her allegations do not rise to the level of intentional extreme and outrageous conduct. This is particularly true with regard to the IIED claim against Steve Berman. Plaintiff's allegations regarding Berman rely solely on the letters attached as Exhibits to the Motion to Dismiss and incorporated in the Complaint. The statements made in these letters are not extreme and outrageous as a matter of law. Plaintiff's proposed amendments to paragraphs 84-86 of the FAC, which allege

that Defendants gave her "false hope" by failing to accurately advise her about the likelihood of success in litigation, also do not rise to the level of extreme and outrageous conduct. [FAC ¶¶ 4, 26, 70, 84-86, 91.] *See Bradshaw*, 805 F.2d at 114 (finding misleading employee regarding chance of rehire and threatening foreclosure of doubtful legality by a law firm insufficient to establish extreme and outrageous conduct).

In addition, Plaintiff failed to address the lack of allegations establishing that the Hagens Berman Defendants intended to cause severe emotional distress or proceeded with knowledge that severe emotional distress would occur. Knowledge of the general stress associated with litigation cannot establish that the Hagens Berman Defendants knew that severe emotional distress would occur. Plaintiff's IIED claim fails under Minnesota and Pennsylvania law.

## E. The amended conspiracy claim fails under Minnesota and Pennsylvania law.

Sampson recognizes that her original conspiracy claim failed to allege the required agreement between Reeves and the Hagens Berman Defendants to breach their fiduciary duties.  In an attempt to address this failure, Sampson's amended conspiracy claim asserts that Reeves and Hagens Berman agreed to enter into a Joint Prosecution Agreement and unlawfully agreed to file Sampson's thalidomide complaint based on a template instead of individual allegations relating to the statute

of limitations. [Doc 48-1, 16; FAC at ¶ 89.] These new (and inaccurate) allegations do not save Sampson's conspiracy claim under Minnesota or Pennsylvania law.[3]

First, Sampson recognizes that the agreement to enter into the Joint Prosecution Agreement was not unlawful, [Response, 16], and for that reason alone the claim fails.

Second, there is no allegation that Gordon Legal and Hagens Berman acted with an intent to injure Sampson or actually injured Sampson when they allegedly conspired to file Sampson's thalidomide complaint based on a template rather than individualized allegations.

Proof of an intent to injure the plaintiff is an essential element of a conspiracy. *Ness v. Gurstel Chargo, P.A.*, 933 F. Supp. 2d 1156, 1171 (D. Minn. 2013) ("[A] plaintiff must allege with sufficient particularity and demonstrate with specific material facts that the parties reached some agreement and conspired together to injure the plaintiff."); *Romy v. Burke*, 2003 WL 21205975, at *4 (Pa. Com. Pl. May 2, 2003) (dismissing conspiracy claim when plaintiff failed to "set forth facts showing malice on the part of their conflicted attorneys"). Thus, even accepting as true the allegations in the proposed FAC Plaintiff fails to state a claim for conspiracy.

---

[3] This new allegation also provides no support for her claim as to Steve Berman, as the agreement was with Hagens Berman Sobol Shapiro LLC, not Mr. Berman in his personal capacity.

F.    **The statute of limitations bars claims based on the promise of success within 18 months.**

Sampson failed to respond to the argument that the statute of limitations barred all claims based on the Hagens Berman Defendants's alleged reaffirmation that Plaintiff's thalidomide claims would resolve in her favor within 18 months. [*Compare* Doc 18-1, 21-32, *with* Doc 48-1.] Additionally, none of the proposed amendments address this issue. By failing to rebut this argument, Plaintiff concedes that her claims based on this alleged misrepresentation fail as a matter of law.

II.   **Conclusion**

The Hagens Berman Defendants request that their motion to dismiss be granted and that Plaintiff's Motion for Leave to Amend be denied.


DATE: September 11, 2020          Respectfully submitted,

                                  *s/ Keith Beauchamp*

                                  COPPERSMITH BROCKELMAN PLC

                                  Keith Beauchamp (*pro hac vice*)
                                  kbeauchamp@cblawyers.com
                                  Roopali H. Desai (*pro hac vice*)
                                  rdesai@cblawyers.com
                                  2800 N. Central Avenue, Suite 1900
                                  Phoenix, AZ 85004
                                  Telephone: (602) 381-5490
                                  Facsimile: (602) 224-6020

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI LLP

Gaetan J. Alfano
Pennsylvania Bar No. 32971
GJA@pietragallo.com
Douglas E. Roberts
Pennsylvania Bar No. 321950
DER@pietragallo.com
1818 Market Street, Suite 3402
Philadelphia, PA 19102
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

*Attorneys for Hagens Berman Sobol
Shapiro, LLP, and Steve Berman*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on August 20, 2020, the foregoing Combined Response to Plaintiff's Motion for Leave to File Amended Complaint and Reply in Support of the Hagens Berman Defendant's Rule 12(b)(6) Motion was filed electronically and served on all counsel of record via the Court's CM/ECF system.

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI LLP

*s/ Douglas E. Roberts*

Gaetan J. Alfano
Pennsylvania Bar No. 32971
GJA@pietragallo.com
Douglas E. Roberts
Pennsylvania Bar No. 321950
DER@pietragallo.com
1818 Market Street, Suite 3402
Philadelphia, PA 19102
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

*Attorneys for Hagens Berman Sobol Shapiro, LLP, and Steve Berman*